**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TRANSAMERICA INVESTMENT GROUP, INC. | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-12-1102 |
| TRAVIS M. HAMILTON, | § § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This suit arises out of an alleged promise by Travis M. Hamilton to TransAmerica Investment Group, Inc. d/b/a Sky Cargo Solutions, Inc., to pay a commission for assistance in finding financing for the purchase and sale of six Citation X aircraft. The plaintiff, TransAmerica, alleges that it found financing for Hamilton but he refused to pay the promised $50,000 commission for each of the six aircraft when they were sold. TransAmerica asserts causes of action for breach of contract and quantum meruit.

Hamilton, an Oklahoma resident and the only defendant, has moved under Federal Rule of Civil Procedure 12(b)(2) to dismiss the claims asserted against him for lack of personal jurisdiction. (Docket Entry No. 3.) Hamilton argues that he is not subject to general jurisdiction in Texas because he lacks continuous and systematic contacts with the State and that he is not subject to specific jurisdiction because the only contacts he had with Texas related to this dispute were made in his capacity as the managing member of Hamilton Capital Partners Ltd. Hamilton has submitted two affidavits in support of his arguments. (Docket Entry No. 3-1, at 6–7; Docket Entry No. 8-1.) In response, TransAmerica has submitted an affidavit by its president, John B. Berry, stating that

the conversations he had with Hamilton, and Hamilton's written promise to pay the disputed commission amount, were all communicated in terms of an individual obligation and were not qualified or limited in any way.  (Docket Entry No. 10, at 5–6.)

Based on the pleadings; the motion, response, and reply; the record; and the relevant law, this court denies Hamilton's motion.  The reasons are explained below.

## I.     The Legal Standards

### A.     Rule 12(b)(2)

When a nonresident defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of demonstrating facts sufficient to support jurisdiction.  *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citations omitted).  "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *Id.*  "When the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a *prima facie* case that personal jurisdiction is proper.'"  *Quick Techs.*, *Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343 (5th Cir. 2002) (quoting *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994)).  The court "must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts."  *Stripling v. Jordan Prod. Co.*, *LLC*, 234 F.3d 863, 869 (5th Cir. 2000) (quoting *Latshaw v. Johnson*, 167 F.3d 208, 211 (5th Cir. 1999)).  But the court is not obligated to credit conclusory allegations, even if uncontroverted.  *Panda Brandywine Corp. v. Potomac Elec. Power*, 253 F.3d 865, 868 (5th Cir. 2001).

### B.     Personal Jurisdiction

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if the long-arm statute of the forum state confers personal jurisdiction over that defendant

and exercising such jurisdiction is consistent with due process.  *Delgado v. Reef Resort Ltd.*, 364 F3d 642, 644 (5th Cir. 2004).  Because the Texas long-arm statute confers jurisdiction to the limits of due process, "the two-step inquiry collapses into one federal due process analysis." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).

Federal due process permits the exercise of personal jurisdiction over a nonresident defendant when the defendant has "minimum contacts" with the forum state such that the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." *Id.*  The "minimum contacts" aspect of the analysis can be established through "contacts that give rise to 'specific' personal jurisdiction" or contacts "that give rise to 'general' personal jurisdiction." *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001).  A court has general jurisdiction over a nonresident defendant "to hear any and all claims" against him when his contacts with the state are so "'continuous and systematic' as to render [him] essentially at home in the forum." *Goodyear Dunlop Tires Operations v. Brown*, 131 S. Ct. 2846, 2851 (2011).  "The 'continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum.'" *Johnston*, 523 F.3d at 609 (quoting *Submersible Sys., Inc. v. Perforadora Cent., S.A.*, 249 F.3d 413, 419 (5th Cir. 2001)).  "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction." *Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002).  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear*, 131 S. Ct. at 2853–54.

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes

3

jurisdiction.'" *Id.* at 2851 (citation omitted).  A court asks "whether there was 'some act by which the defendant purposefully availed [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* at 2854 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  Specific jurisdiction exists "when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008) (internal quotations marks omitted).  Though the defendant's contacts with the forum must be more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person," even "isolated or sporadic contacts" can support specific jurisdiction "so long as the plaintiff's claim relates to or arises out of those contacts." *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498–99 (5th Cir. 2012) (internal quotation marks omitted).

Once a plaintiff has established minimum contacts, the burden shifts to the nonresident defendant to show that asserting jurisdiction would offend traditional notions of fair play and substantial justice.  *Walk*, 517 F.3d at 245.  "[I]t is incumbent on the defendant to present a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir. 1992).  "In conducting the fairness inquiry, [courts] examine (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006).

**III.    Analysis**

4

Citing *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773 (5th Cir. 1986), Hamilton argues that he is not subject to personal jurisdiction in Texas because merely contracting with a Texas company does not establish minimum contacts.  "If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, . . . the answer clearly is that it cannot."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).  The Supreme Court has "long ago rejected the notion that personal jurisdiction might turn on mechanical tests, or on conceptualistic theories of the place of contracting or of performance."  *Id.* at 479 (alterations, citations, and internal quotations marks omitted).  Instead, the Court has "emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'"  *Id.* (citation omitted).  "The factors of prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."  *Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 872 (5th Cir. 1999) (citing *Burger King*, 471 U.S. at 479).

TransAmerica has made a *prima facie* showing of specific jurisdiction.  TransAmerica has alleged that Hamilton promised to pay a commission of $50,000 for each of the six aircraft when sold in exchange for TransAmerica's work in finding financing for the purchase and sale of the aircraft.  The allegations and evidence show that Hamilton: initiated the contact with TransAmerica in Texas to obtain its assistance in locating financing; had "constant" communications over an extended period about the commissions contract in Texas; arranged to negotiate this contract in Texas; and hired a Texas attorney to negotiate from Texas the financing terms and the purchase of

5

the aircraft from the seller.  These allegations, discussed in more detail below, are sufficient for a *prima facie* showing of specific jurisdiction.  *See Nogle & Black Aviation, Inc. v. Faveretto,* 290 S.W.3d 277, 283 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that the court had personal jurisdiction over a nonresident defendant in Texas because that defendant specifically chose to enter into a contract with a Texas resident for services to be performed in Texas).

  *Holt Oil* does not compel a different result.  In *Holt Oil*, the plaintiff sued Harvey, an Oklahoma resident, in Texas for breach of contract.  "Harvey's only contacts with Texas as relating to the . . . controversy were as follows: (1) Harvey entered into a contract with Holt, a Texas corporation; (2) Harvey sent a final revised joint operating agreement from Oklahoma to Texas; (3) Harvey sent three checks from Oklahoma to Texas in partial performance of its contractual obligations; and (4) Harvey engaged in extensive telephonic and written communication with Holt." *Holt Oil*, 801 F.2d at 777–78.  The Fifth Circuit concluded "that these limited contacts were insufficient to support an exercise of specific jurisdiction." *Id.* at 778.  The court explained that though "the contractual relationship between Holt and Harvey may have been cemented in Texas, the significance of th[at] fact [was] diminished by the contract provision specifying that Oklahoma law would govern the agreement." *Id.*  The court's conclusion was "further bolstered by the fact that performance of the contract was centered in Oklahoma rather than Texas." *Id.*  "Given that the material performance occurred in Oklahoma, the fact that Harvey mailed payments to Texas [did] not weigh heavily" in the minimum contacts analysis. *Id.*  "Finally, the exchange of communications between Texas and Oklahoma in the course of developing and carrying out the contract was in itself also insufficient to constitute purposeful availment of the benefits and protections of Texas law." *Id.*  The court explained that the "communications to Texas rested on

6

nothing but the mere fortuity that Holt happen[ed] to be a resident of the forum." *Id.* (alteration, citation, and internal quotations marks omitted).

The record in this case reveals that Hamilton had more and more substantial contacts with Texas than the nonresident defendant in *Holt Oil*. The contract that forms the basis of TransAmerica's claims against Hamilton arose out of an extensive and longstanding business relationship between Hamilton and TransAmerica. John B. Berry, TransAmerica's president, stated in his affidavit that starting in the fall of 2004, Hamilton "was an integral part of the planning and introduction of the new cargo aviation line of business for TransAmerica and plans were discussed for Hamilton to move to Houston." (Docket Entry No. 4, at 9.) Berry explained:

> Over the next years, Hamilton was a much valued and integral part of TransAmerica which conducted business from its offices in Houston, Texas. Hamilton and others were provided and distributed business cards that listed TransAmerica's address and headquarters in Houston, Texas. Hamilton utilized an individually assigned SkyCargo email address, represented TransAmerica in Texas and elsewhere, used and distributed TransAmerica corporate materials, earned, and was paid hundreds of thousands of dollars by TransAmerica to his bank accounts located in Texas and elsewhere. Hamilton held himself out as being a key part of TransAmerica and had daily contact with me in Houston regarding current and proposed transactions in which he was actively involved. Hamilton regularly traveled to Houston and we met many times in both Houston and Dallas to conduct business and meet with clients.

(*Id.*)

The record reveals that given the parties' preexisting business relationship, Hamilton specifically chose to contract with TransAmerica in Texas to obtain its help in locating financing for the Citation X aircraft. Hamilton chose to make Texas the hub of his activities for negotiating the financing terms for, and the purchase of, the six aircraft. Berry explained that in May 2009, "Hamilton informed TransAmerica . . . that up to six Cessna Citation X aircraft that were operated

7

by, but not owned by XO Jet, were available for sale at a potentially discounted price given the turmoil in the financial markets." (*Id.* at 10.)  Hamilton "contacted [Berry] in Texas to solicit TransAmerica's support for the transaction and requested TransAmerica's assistance in locating and obtaining the needed debt financing given TransAmerica's expertise in this area." (*Id.*)  Hamilton also told Berry that "David G. Mayer, a Patton & Boggs partner in Dallas, Texas would negotiate the contract" with the seller of the aircraft "for him." (*Id.*)  After TransAmerica suggested PNC Bank "as a very good fit for the financing [Hamilton] requested," Hamilton "agreed and provided additional documents and information to [Berry] in Texas sufficient for TransAmerica to approach" PNC. (*Id.*)  "Hamilton was in constant contact with [Berry] in Texas as he supplied [Berry] with all of the pertinent details of the transaction including aircraft serial numbers, specifications, title reports, etc." (*Id.* at 11.)  "TransAmerica continued to work and participate in a number of conference calls from Houston along with Hamilton and others including Mr. Mayer and other associations of Patton & Boggs in Dallas" and submitted financing applications to PNC on Hamilton's behalf. (*Id.*)  After TransAmerica "handed-off Hamilton to PNC," "Hamilton and his Texas counsel . . . continued to negotiate from Texas with the aircraft seller and PNC over final terms." (*Id.*)  The extensive and longstanding business relationship between Hamilton and TransAmerica; Hamilton's deliberate choice to contract with TransAmerica in Texas; the "constant contact" between Hamilton and Berry after TransAmerica identified PNC; Hamilton's hiring Texas counsel to negotiate from Texas the financing terms for and purchases of the aircraft; and the fact that the Hamilton-TransAmerica contract envisioned performance by both parties in Texas (payment of the commission to TransAmerica in Texas and TransAmerica's performing its financing search

8

from Texas), support the exercise of personal jurisdiction over Hamilton by this Texas court in a dispute over his failure to pay the commission TransAmerica alleges it was owed.

Invoking the fiduciary-shield doctrine, Hamilton argues that he is not subject to personal jurisdiction in Texas because his contacts with TransAmerica "concerning the six Citation X aircrafts [were] in his capacity as the managing member of Hamilton Capital Partners Ltd." (Docket Entry No. 8, at 5.)   Under the fiduciary-shield doctrine, "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation." *Stuart*, 772 F.2d at 1197. "Succinctly paraphrased, 'jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation.'" *Id.* n.11 (citation omitted).   Courts have held, however, that the doctrine "is inapplicable to corporate officers who, in their role as corporate agents, injure persons by virtue of their tortious activity even if such acts were performed within the scope of their employment as corporate officers." *Digman v. Cummings*, No. 2:11–CV–91–J, 2011 WL 5822422, at *4 (N.D. Tex. Nov. 16, 2011).   "This rule is not based on an exception to the fiduciary shield doctrine, but rather on the well-established principle that 'a corporate officer is primarily liable for his own torts.'" *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.) (citation omitted).   "[I]f the evidence suggests that the nonresident officer participated in tortious or fraudulent activities, which were directed at Texas and for which he may be held personally liable, then there is a sufficient basis to assert specific jurisdiction over him." *Id.* at 709.   TransAmerica, however, has not alleged that Hamilton committed fraud or other intentional tort.   The fiduciary-shield doctrine could bar the exercise of personal jurisdiction over him.   But on the present record, the evidence as to whether Hamilton entered into a contract to pay TransAmerica $300,000 in commission as an

individual or solely on behalf of a partnership is disputed.  Hamilton asserts that his communications with SkyCargo about the six aircraft were solely as managing member of Hamilton Capital Partners Ltd.  (Docket Entry No. 8-1, at 1.)  TransAmerica disputes this, pointing to the fact that Hamilton never mentioned that he was acting other than in his own capacity and that the email address Hamilton used for some of the communications relating to the six aircraft was an email account he had with TransAmerica d/b/a SkyCargo as a result of his extensive and longstanding business dealings with that company.  (Docket Entry No. 10, at 5–6.)

Based on the current record, the motion to dismiss based on lack of specific personal jurisdiction is denied.  This result makes it unnecessary to address the general jurisdiction argument, although it is worth noting that there is evidence of numerous contacts initiated by Hamilton with TransAmerica from 2004 to 2008 (the dispute at issue arose in 2009).  Based on the current record, this court cannot conclude that exercising personal jurisdiction over Hamilton in Texas would offend traditional notions of fair play and substantial justice.

## IV.    Conclusion

Hamilton's Rule 12(b)(2) motion to dismiss, (Docket Entry No. 3), is denied.

SIGNED on May 29, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

10