# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| TRANSAMERICA INVESTMENT GROUP, INC., d/b/a Sky Cargo Solutions, Inc., | § § § | |
| Plaintiff, | § § | |
| v. | § § § | CIVIL ACTION 4:12-CV-01102 |
| TRAVIS M. HAMILTON, and HAMILTON CAPITAL PARTNERS, LLC, | § § § | |
| Defendants. | § § | |

## AFFIDAVIT OF TRAVIS M. HAMILTON

On this day, Travis M. Hamilton appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said:

1.      My name is Travis M. Hamilton.  I am over the age of 18.  I have never been convicted of a felony or any crime involving moral turpitude, I am not otherwise disqualified by law from making this Affidavit, and I have personal knowledge of the facts stated herein and swear that such facts are true and correct.

2.      The loan transaction made the subject of this lawsuit started with my relationship with Chuck Stumpf at XOJet ("XO").  XO is a private jet charter company.

3.      In approximately May 2009, Mr. Stumpf brought an opportunity to me to participate in finding a solution for XO to purchase certain aircraft and simultaneously terminate existing leases with Laminar Portfolios, LLC, a company that I understood was affiliated with Lehman Brothers ("Lehman").  This opportunity led to extensive conversations with XO.  I also discussed the prospective transaction with several lenders that could potentially provide financing.  In this same timeframe, I also discussed this



**AFFIDAVIT OF TRAVIS M. HAMILTON**                                                    **PAGE 1**

opportunity with John Berry, who I know to be President of Plaintiff TransAmerica Investment Group, Inc., d/b/a Sky Cargo Solutions, Inc. ("Sky Cargo"). Mr. Berry told me he could assist in arranging financing for the XO transaction.

4.      Thereafter, I continued to discuss this transaction with representatives of XO and Mr. Berry, among others. As was typical of this type of transaction, I was required to sign non-disclosure agreements and, thereafter, XO provided certain information to me to present to Mr. Berry and the other financial institutions considering the transaction.

5.      Sometime around the beginning or middle of May 2009, Mr. Berry told me he had a very good relationship with PNC Bank ("PNC") and that PNC would provide the financing for the XO transaction on terms acceptable to the borrowers. After some initial discussions with PNC, I was informed by Wayne Starling ("Starling") at PNC that PNC was not going to move forward with the XO transaction due to a previous loan PNC had inherited from Park National Bank. I also discussed financing with other lenders, such as Siemens, Amentum Capital, and Macquarie, who also initially passed on the deal.

6.      Though financing sources for the XO transaction were not firmly in place, I continued to engage in discussions with XO and with individuals associated with Lehman. I also had several conversations with Clay Healey ("Healey"), a potential investor / facilitator for the transaction and a representative of the borrowers (ultimately, organized as limited liability companies), about this deal and about ways to keep the deal from falling through. In the meantime, from time to time, Mr. Berry inquired about the XO deal and at some point represented that he had PNC ready to provide financing for

**AFFIDAVIT OF TRAVIS M. HAMILTON**                                          **PAGE 2**

the transaction.  At that point, I provided Mr. Berry by telephone with a financing scenario which would be acceptable to the borrowers.  It is my understanding, based on information received from PNC, that Mr. Berry then prepared an "Executive Summary" of a proposed deal and presented same to PNC.  To date, I have not seen the Executive Summary presented by Mr. Berry to PNC and cannot confirm that it accurately represented the required deal points that I had provided to Mr. Barry; however, as explained below, the available evidence indicates that it probably did not.

7.      I then spoke with Healey about PNC and Healey advised me that he had a long-standing relationship with PNC because his company, AIC Title, was PNC's exclusive agent for title and escrow services on all of PNC's aircraft loans; thereafter, Healey, based on his preexisting relationship with PNC, began discussing the transaction directly with PNC.  At that time, I had no assurance from PNC that the financing scenario I had previously presented to Mr. Berry by phone was acceptable to PNC, and Mr. Barry had not procured financing acceptable to the borrowers.

8.      In July 2009, Mr. Barry and I had telephone conversations concerning PNC financing and his inability to secure financing on terms acceptable to the borrowers. Since it appeared that Mr. Barry would not be able to secure financing, I proposed a way that he could add value to the transaction and thus make some money in connection with this transaction.  I proposed to Mr. Barry that if the deal went through, the purchasers of the aircrafts would be seeking to sell the aircrafts, and if Mr. Barry located buyers for the aircraft who closed a sale, he would be paid a fee of $50,000 for each aircraft sold to a buyer he presented.  I followed the telephone conversation with a short e-mail on July 17, 2009, which advised Mr. Berry of the fee that would be paid if he secured buyers for the

aircrafts.   That e-mail is attached to the Affidavit of John B. Berry in Support of Plaintiff's Motion for Summary Judgment (the "Berry Affidavit") as Exhibit "2".   The context of the e-mail is the telephone conversation I had with Mr. Berry concerning him locating qualified buyers for the various aircraft and the payment to him mentioned in the email is the payment we discussed by telephone to be paid when the various aircraft were sold to buyers secured by Mr. Berry.  Mr. Berry did not accept the proposal that I made in July 2009 and his assertion, at Paragraph 13 of the Berry Affidavit, that the e-mail was an offer was to compensate him for securing PNC financing is false.  In fact, not only did Mr. Berry fail to accept the July 17th proposal, he did not procure a single buyer for any of the six aircraft.  Several months later, on Monday, September 14, 2009, Mr. Berry sent an e-mail message to me wherein he purported to confirm the terms of a totally different agreement between Sky Cargo and Defendant Hamilton Capital Partners, LLC ("HCP").  HCP did not make the purported agreement referenced in the September 14th email, and did not further respond to Mr. Berry.  The aforementioned September 14th e-mail is attached hereto as Exhibit "1".

    9.      Sometime in mid to late July 2009, I learned Mr. Berry had presented a summary of the transaction to PNC that was incorrect inasmuch as it misrepresented multiple aspects of the prospective transaction.  At that point, Mr. Berry had not procured financing for the deal, and as far as his efforts were concerned, financing with PNC was a dead issue.

    10.     The prospective borrowers for the transaction then engaged David G. Mayer ("Mayer"), an attorney at Patton Boggs LLP, to represent their interests in the proposed transaction.  Following Mayer's engagement as counsel for the borrowers, he

immediately began negotiating the terms of the purchase agreements with Lehman and negotiating a loan arrangement with PNC.  To my knowledge, Mayer promptly engaged in negotiation with Woody Woodring ("Woodring"), a senior aviation lending officer at PNC in Pittsburgh, to facilitate the loan, at which point the aircraft loan proposal was moved from PNC in Boise (the location where Mr. Berry had sent the misinformation)  to PNC's offices in Pittsburgh.

11.     Based on my role in, and personal dealings with respect to, the PNC loan transaction that was obtained, I can affirm that Mr. Berry did not procure a loan from PNC on terms acceptable to the borrowers.  In fact, his extremely limited involvement was delivering a proposal to PNC that was neither accurate nor acceptable.  His limited role in making an erroneous proposal did not add value to the transaction, and would not have been the basis for the borrowers or HCP (or myself) to pay him a fee in connection with the PNC loan that ultimately was obtained.  He also had no material involvement in the negotiation and finalization of the loan that ultimately closed on September 16, 2009. In particular, Mr. Berry had no knowledge of the fact that PNC changed several material deal-points shortly before closing and he did not know the acquisition costs for the borrowers or sale price(s) for the sellers.

12.     I personally was not paid for my efforts at, or after, closing to bring about the loan transaction discussed herein with PNC.  Likewise, HCP was not paid at, or after, closing for any services or efforts provided in connection with the PNC loan. Accordingly, assuming Exhibit "1" did reflect an agreement between HCP and Sky Cargo and Mr. Berry, neither Sky Cargo nor Mr. Berry were entitled to any payment from HCP or me.

**AFFIDAVIT OF TRAVIS M. HAMILTON**                                          **PAGE 5**

13.    Further, I have learned from documents produced by Plaintiff in this litigation that PNC paid Sky Cargo a referral fee in the amount of $60,821.25.  Notably, I had no knowledge of this referral fee until after this lawsuit was filed; Mr. Berry never disclosed his arrangement with PNC to me.  Likewise, the borrowers were never made aware of Mr. Berry's compensation arrangement with PNC.  The fact that Mr. Berry sought and obtained a fee from PNC confirms at least the following facts: (i) his efforts to secure financing of the deal was on behalf of PNC and not on behalf of me, HCP, or any of the borrowers; (ii) Mr. Berry's interest in obtaining financing from PNC for a fee from PNC was in direct conflict with the borrower's interests in securing the best possible financing, whether from PNC or others; (iii) Mr. Berry's conflict of interest was never disclosed to me, HCP, or the borrowers, and neither Defendants nor the borrowers acquiesced to or waived that conflict of interest; and (iv) neither I nor HCP would have agreed to pay Mr. Berry (or any potential loan broker) a fee in addition to the fee they were entitled to receive from the lender.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Travis M. Hamilton

SWORN TO AND SUBSCRIBED before me this the 28 day of May, 2013.

_____
Notary Public

**Monday, October 22, 2012 11:56:15 AM Central Daylight Time**

**Subject:** Citation X's

**Date:** Monday, September 14, 2009 4:27:54 PM Central Daylight Time

**From:** John B. Berry

**To:** 'Travis Hamilton'

Travis:

Understand the Citation X transaction will close/fund today or tomorrow -- congratulations!  Know this has been a long road for everyone.

Confirming, our agreement is that TIG receives no fee at this closing since the aircraft are now being grounded and sold immediately.  Instead, TIG and HCP have agreed to share the HCP earnings on an equal basis as the aircraft are sold and closed.  Will you remind me the final percentage of earnings that has been negotiated and confirmed for HCP?  I would also appreciate final confirmation of the basis for each aircraft.  Scheduled to be in office by noon tomorrow.

Thank you.

JBB

John B. Berry
713.840.0110 - Direct
713.840.9135 - FAX

-------------------------------------------------------

NOTICE: This email transmission and all other accompanying documents or other materials contain legally privileged information all of which are covered by the Electronic Communications Privacy Act (18 U.S.C. 2510-2521) and other statutes. The information is intended only for the use of the recipient named above. If you are not an intended recipient, you are hereby notified that any disclosure, copying, forwarding, distribution, posting or exploitation of or taking of any action in reliance on the contents of this email message is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone (collect call if long distance) and/or by e-mail, delete the transmission from your system and destroy any printed copies which you may have made of the transmission.



000263

Page 1 of 1