| | | |
|---|---|---|
| TRANSAMERICA INVESTMENT GROUP, INC., d/b/a Sky Cargo Solutions, Inc., | § § § | |
| Plaintiff, | § § § | |
| v. | § § | CIVIL ACTION 4:12-CV-01102 |
| TRAVIS M. HAMILTON, and HAMILTON CAPITAL PARTNERS, LLC, | § § § § | |
| Defendants. | § | |

## AFFIDAVIT OF DAVID G. MAYER

On this day, David G. Mayer appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said:

1.     My name is David G. Mayer. I am over the age of 18. I have never been convicted of a felony or any crime involving moral turpitude. I am not otherwise disqualified by law from making this Affidavit, and I have personal knowledge of the facts stated herein and swear that such facts are true and correct to the best of my knowledge and belief.

2.     I am an attorney and a partner at Shackelford, Melton & McKinley, LLP ("SMM"). Prior to joining SMM, I was a partner at Patton Boggs LLP ("PB") for more than fifteen years. Generally speaking, in my law practice, I represent and advise clients in aircraft transactions, equipment financing, secured lending, asset-based financing, equipment and facility leasing and purchases and sales of a wide range of assets and facilities. For at least 12 years, I have focused my law practice on representing buyers, sellers, lessors and lenders in the business aircraft transactions industry.

**EXHIBIT**
**RESP - 2**

3. I am a member of the National Aircraft Finance Association, the National Business Aviation Association, and the Equipment Leasing and Finance Association. I am the author of *"Business Leasing For Dummies"* in the well-known "For Dummies" series of books; have written many articles on aircraft issues; and just published a unprecedented global study for the Equipment Leasing & Finance Foundation called: *"Business Aircraft – Gaining Altitude \* From Recession to Recovery, Aircraft Transactions Build Momentum Despite Industry Challenges."*

4. I am familiar with the loan transaction generally described in Plaintiff's Second Amended Complaint (the "Loan Transaction"). The Loan Transaction allegedly involved TransAmerica Investment Group, Inc., d/b/a Sky Cargo Solutions, Inc. ("Sky Cargo").

5. The source of my familiarity and knowledge concerning the Loan Transaction is my representation of the Borrowers (defined below) that planned to use loan proceeds to purchase six (6) private jet aircraft from a Lehman Brothers' affiliate ("Lehman"). My representation commenced in approximately July 2009 while I was a partner at PB. Travis Hamilton and Hamilton Capital Partners, LLC (collectively, "Hamilton") asked me to represent six (6) limited liability companies (collectively, the "Borrowers") formed for the express purpose of acquiring aircraft using loan proceeds that ultimately were made available to the Borrowers by PNC Aviation Finance, a unit of PNC Financial Services Group, Inc. ("PNC").

6. When I was engaged by the Borrowers to assist in the Loan Transaction, the deal was nowhere near completion; in fact, PNC had not completed its required due diligence, legal analysis and full credit analysis; and Lehman's counsel and I still had to

negotiate the purchase agreement in which PNC had an interest and, among many other things, analyze the bankruptcy issues. As we proceeded through the Loan Transaction, PNC required the Borrowers to invest additional equity. On several occasions, I believed that PNC would walk away from the Loan Transaction due to its complexity, pressing timing attributable to the bankruptcy, and lack of equity investment by the Borrowers.

7.     The Loan Transaction could be characterized as extremely complex for at least three (3) reasons. First, Lehman owned the aircraft and, at the time, amid the 2008-2009 financial crisis, filed for bankruptcy in what analysts believed was one of the largest, most intricate bankruptcies ever to occur. Second, the aircraft were subject to certain existing management agreements that were both expensive and burdensome with very difficult negotiators that required consideration that jeopardized the Loan Transaction. Third, at the time of the Loan Transaction, the economy negatively affected PNC's valuation of the aircraft (i.e., its prospective collateral value) more than anyone imagined.

8.     It was critically important to PNC that the pricing of the aircraft accounted fully for the dramatic downward price spiral occurring in aircraft values occurring at the time. For PNC to close the Loan Transaction and meet its financing credit guidelines, it had to believe it could liquidate the aircraft in a default and receive full repayment of its loans. This analysis was at the core of PNC's decision-making because PNC used a non-recourse structure that ultimately relied entirely on the value of the aircraft for repayment; that is, PNC did not receive any guarantees or other financial support to recover its loan fees, principal or interest. It would not, therefore, accept more downside risk in a borrower distress situation without resetting aircraft sales values—a fundamental

change driven largely by market conditions that turned the original deal on its head. PNC did not, and virtually no one involved in aircraft finance at the time could have, fully comprehend the shocking decline in values of the aircraft; so the changes it demanded seemed understandable even though material to the success of the Loan Transaction.

9.      Once PNC realized the challenge it faced and the risk associated sticking with the original terms of the Loan Transaction, it called in Woody Woodring ("Woodring") to take over for the original loan officer at PNC, Morgan Littell ("Littell"). Littell seemed to have insufficient experience to take the Loan Transaction through difficult negotiations and restructuring, but I was not aware of other issues with her actions. Woodring, one of PNC's most senior transaction negotiators, whom I knew (and he knew me), handled the most difficult special projects for PNC.

10.    Thereafter, Woodring and I were able to restructure the Loan Transaction in such a way to ensure the needs of the Borrowers and PNC would be met. Our mutual trust and respect contributed to the confidence of PNC and my clients that we could close this difficult transaction. Ultimately, the Loan Transaction closed on September 16, 2009. I considered it a major accomplishment that it closed on any terms.

11.    I had no reason to believe that John Berry ("Berry") or Sky Cargo were involved in negotiating the terms of the Loan Transaction with PNC – original or restructured. Moreover, during the time when I was representing the Borrowers, I only worked with Hamilton, together with the principals of, trustee for, and family members directly affiliated with, the Borrowers (the "Borrower Parties"). Berry could not have participated as I had no authority other than that provided by Hamilton and, to a limited

extent, by the Borrower Parties. Accordingly, I do not recall ever receiving any communication from Berry in any aspect of the Loan Transaction.

12. It is alleged that Sky Cargo initially presented PNC with the opportunity to make the aircraft acquisition loan to the borrowers, and that PNC paid Sky Cargo a referral fee in the amount of $60,821.25. That PNC allegedly paid Berry a fee astonished me. I did not expect PNC to pay anyone a fee as I had no idea that Berry was allegedly involved in any respect with PNC, which is typically an issue that arises in aircraft purchase transactions.

FURTHER AFFIANT SAYETH NOT.

David G. Mayer

SWORN TO AND SUBSCRIBED before me this the 20th day of May, 2013.

Notary Public

SONIA DE LEON
My Commission Expires
January 6, 2017