IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRANSAMERICA INVESTMENT GROUP, | § | |
| INC., d/b/a Sky Cargo Solutions, Inc., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-1102 |
| | § | |
| TRAVIS M. HAMILTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION ENTERING FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**I.     Introduction**

The plaintiff, Transamerica Investment Group, Inc., d/b/a Sky Cargo Solutions, Inc. ("Sky Cargo"), sued Travis M. Hamilton and his company, Hamilton Capital Partners, Inc. ("HCP"), seeking payment for its role in locating the lender that financed the purchase of six Citation aircraft by six entities (the "Borrowers") formed for that purpose. Sky Cargo's principal, John Berry, contacted PNC Aviation Finance ("PNC Bank")[1] about the proposed loan, and PNC Bank ended up financing the loan that ultimately closed. Neither Hamilton nor HCP received compensation when the loan closed, but did receive a total of $1.5 million —$250,000 for each aircraft — when the Borrowers subsequently resold the aircraft. In this suit, Sky Cargo claimed the right to payment for its role using different measures, including half of the $1.5 million HCP received.

Hamilton denied any agreement or obligation to pay Sky Cargo. Hamilton emphasized that Berry's role was limited; that within that limited role, many of his actions were unhelpful and indeed

---

[1] PNC Aviation Finance is a division of PNC Equipment Finance LLC, which is a subsidiary of PNC Bank, National Association.

threatened to prevent the loan from closing; and that Berry asked for and received a finder's fee from PNC Bank that he did not disclose to Hamilton.

A bench trial was held on August 7, 2013. The court heard testimony from Berry, Hamilton, and David Mayer, a lawyer brought in to represent the Borrowers in the loan negotiations. At trial, Sky Cargo acknowledged that it had no basis to recover for breach of an express contract to pay for Berry's services, effectively abandoning that claim. The court agrees and finds and concludes that the evidence and the law defeat any recovery for breach of an express contract. Sky Cargo's breach of contract claims are dismissed, with prejudice.

Based on the evidence and the law, this court finds and concludes that, while there was no express contract, there was an implied contract, based on quantum meruit, for HCP to compensate Sky Cargo for the services Berry provided. The proper measure of that relief is far less than Sky Cargo seeks. There is no basis to award Sky Cargo half of the revenues or of the profit HCP ultimately received when the aircraft were subsequently sold. Nor is it appropriate to use the alternative proposed measure of $50,000 per aircraft. Although Hamilton offered this amount to Sky Cargo in July 2009, Berry did not accept the offer and instead made a counteroffer, which Hamilton did not accept. Hamilton made the $50,000 per aircraft offer before he realized how much work and effort by others would be required to close the loan and how much the terms would differ from those Berry had presented. Hamilton also made this offer before Berry's work abruptly ended at the end of July 2009.

This court finds that the quantum meruit factors applied to the evidence support an award of $10,000 per aircraft, for a total of $60,000. That is very close to the amount Sky Cargo received from PNC Bank as a finder's fee, which provides an indication of the reasonable value of what Berry testified was the primary service he provided, the referral to PNC Bank. Because the parties clearly

understood that Sky Cargo would receive no payment until after the aircraft were resold, prejudgment interest would not begin to run until that date.

Accordingly, based on the findings and conclusions set out below, this court enters final judgment dismissing Sky Cargo's breach of an express contract claim, with prejudice; finding a basis for recovery under quantum meruit; and awarding Sky Cargo $60,000.00. Sky Cargo may submit evidence of its attorney's fees by affidavit.

The findings of fact and conclusions of law are explained in more detail below.[2]

## II. Findings of Fact

In May 2009, Hamilton was seeking financing for the sale of two new Citation aircraft. The proposal was that XO Jet would acquire the aircraft. (Def.'s Ex. 1). Hamilton discussed the opportunity with Berry, who said that he could assist with locating financing for the proposed transaction. Berry told Hamilton that he had a good relationship with PNC Bank. Berry contacted Morgan Littell, a Senior Financing Officer at PNC Aviation Finance in Boise, Idaho. The proposal Berry presented was for the acquisition of two new aircraft, a loan of up to $20 million or 60 % loan to value, whichever was lower, and a commission arrangement under which HCP would receive a fee based on 1 % of the loan amount, to be divided equally with Sky Cargo. This proposal failed. PNC Bank rejected it in part because it had a previous bad loan experience with XO Jet. (Def.'s Exs. 1-6).

Hamilton developed another proposal in May 2009 under which six used aircraft, not two new aircraft, would be financed and sold to three entities that would acquire two planes each. XO Jet was still involved, and the proposed commission arrangement of dividing 1% of the loan amount

---

[2] Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

3

(of approximately $60 million) between Sky Cargo and HCP remained. PNC Bank rejected this proposal as well.

Hamilton and others put together a revised proposal for nonrecourse financing of the six used aircraft, without XO Jet's involvement. The emails admitted into evidence and the testimony show that after the earlier proposals failed, Hamilton continued to ask Berry to continue working on aspects of what became the next proposal. Berry continued to email and talk with Hamilton about suggestions on structuring the transactions. (Pl.'s Ex. 16). Hamilton did not use most of these suggestions, in part because, as Hamilton advised Berry, PNC Bank found some unacceptable and required many changes in the proposed loan terms. (*See* Def.'s Ex. 21).

By mid-July 2009, the emails show that Berry was working on the proposed loan and sale transaction for the six aircraft with no express agreement with Hamilton about payment for that work. But the emails show that the parties expected Sky Cargo would be paid on some basis. On July 13, Berry emailed Hamilton asking "what dollar amount and/or percentage of profits [Sky Cargo] should expect to receive for its work in this transaction?" (Pl.'s Ex. 28). Berry also asked whether the Borrowers needed to agree to or acknowledge any arrangement to pay Sky Cargo. (*Id*.). In response, Hamilton wrote: "I have not calculated that yet. HCP gets paid as the aircraft sells. I will be responsible for paying, the [Borrowers] will not have that responsibility." (*Id*.). Berry then asked, "[s]o what is HCP receiving in dollars or percentages from the proceeds as each aircraft is sold? HCP does have a contract with the [Borrowers] for its portion — right? Given HCP's agreement with the [Borrowers], what dollar amount or percentage should [Sky Cargo] expect to receive from HCP's side of the transaction as each aircraft is sold?" (*Id.*, Ex. 29). Hamilton replied: "My engagement is as advisor to the transaction, as I am being compensated based on performance. I am not being paid at closing, but on the upside of the sale of the aircraft. I am willing to pay [Sky

Cargo] a portion of those profits, but we have not determined what compensation I will be paid totally. It depends on what each aircraft are sold for." *(Id.)*.

On July 17, 2009, Hamilton wrote to Berry and stated: "I have been able to work the numbers and I am able to pay 50K per aircraft as they are sold for your assistance in this deal." (Def.'s Ex. 9). Berry did not respond to this offer, and the evidence shows that he did not accept it. Hamilton testified that the July 17 email was an offer to pay Sky Cargo only if it located buyers for the aircraft. But the evidence leads the court to find that Hamilton's testimony on this point was not credible. The evidence shows that in the July 17 email and the communications leading up to it, Hamilton and Berry were discussing how and when to compensate Sky Cargo for Berry's work in the loan transaction, not for his role in any subsequent aircraft sales. The evidence shows that the proposed delay in paying Sky Cargo was to allow Hamilton to be paid first, which would not occur until the subsequent aircraft sales. The July 17 email from Hamilton stated that the compensation he offered was for Berry's "assistance in this deal." "This deal" is the loan transaction that preceded the aircraft sales.

The court finds that the offer made in the July 17 email was to pay Sky Cargo $50,000 per aircraft for Berry's role in the loan transaction, and to defer that payment until the aircraft were subsequently sold. It is undisputed that Berry did not accept this offer, and instead later made a counteroffer rejecting it, as well as prior arrangements.

Emails exchanged in the days following the July 17 offer show Hamilton's increasing concern over Berry's work on the loan transaction. In more and more urgent tones, Hamilton asked Berry for information about PNC Bank's position on a number of points. Hamilton repeatedly complained that he had not heard from Berry and that the deal was in "situation critical." (Def.'s Ex. 10; Pl.'s Exs. 31, 33, 35, 39, 40, 41). In late July 2009, Hamilton feared that the transaction was

5

"imploding" and would not close. Hamilton emailed Berry that unless this situation improved, he would have to personally take over communications with PNC Bank. (Def.'s Ex. 10).

As Berry's financing discussions floundered, Hamilton began working with PNC Bank through a source unrelated to Berry, Clay Healey, who had an independent, preexisting relationship with PNC Bank. In late July, the Borrowers hired David G. Mayer with the law firm Patton Boggs LLP to represent their interests. The proposed loan-and-acquisition transaction was complicated to begin with, and some aspects of Berry's involvement after the initial introduction and presentation to PNC Bank contributed to the complications. The credible evidence shows that, although Hamilton asked Berry for work after he made the initial introduction and presentation to PNC Bank, some of the work Berry did was unhelpful to closing the loan. Indeed, some of that work threatened to stop the loan from closing at all.

It is undisputed that in late July, Mayer and Hamilton took over negotiating the financing with PNC Bank. (Def.'s Ex. 11). Berry had no further involvement in working to close the loan. As a result of Mayer's efforts, the loan negotiations moved from PNC Bank's Boise office, where Berry's introduction had been made and where his contact worked, to PNC Bank's Pittsburgh office. That office was staffed with lending officers who had expertise in complex loans to acquire aircraft. Berry had no role in the discussions and work that Mayer and Hamilton did during and after late July 2009 to close the loan.

On September 3, 2009, Berry emailed a PNC Bank vice-president expressing surprise over learning that there had been major problems with the loan and denying any responsibility for those problems. The email stated:

> [S]ince referring and introducing the transaction to PNC, our company has not participated in the process at all. We have not been privy to any of the term sheets or commitment letters that have been issued by PNC. In fact, we have not seen the application forms,

> valuation reports, or any other transactional details which have all been handled and negotiated directly between PNC and the borrowers after we made the referral. . . .
>
> . . . .
>
> [O]ur only expectation from PNC is to receive the modest 1/4th of 1% referral fee on or about the closing date which was discussed and agreed [to] prior to us making the referral to PNC. We had originally asked for more standard 1/2 of 1% referral fee, but agreed to the smaller fee at [PNC Bank's] request.

(Def.'s Ex. 13). PNC Bank split the 1/4 of the 1% referral fee with Sky Cargo, which ultimately received $60,831.25. (Def.'s Ex. 14).

The PNC Bank loan that Mayer structured closed. The Borrowers acquired the aircraft. Important terms of the loan and sale differed from those Berry had first introduced to PNC Bank, beyond the change from a loan to acquire two new aircraft to a loan to acquire six used aircraft. The borrowers and purchasers changed; the loan-to-value ratio was lower; the acquisition price changed; the interest rates changed; and the Borrowers had to pay more equity. In short, as Hamilton testified, the transaction that Mayer's work brought to a successful conclusion in September 2009 was thoroughly restructured from the transaction Berry introduced to PNC Bank in May 2009. And Berry's role had ended months before the loan closed. Berry acknowledged as much in his September 3 email to PNC Bank: "since referring and introducing the transaction to PNC[,] our company has not participated in the process at all." (Def.'s Ex. 13).

HCP did receive a substantial amount — $250,000 per aircraft — when the Borrowers subsequently sold the aircraft in transactions that Hamilton arranged. Hamilton worked on those transactions for seven months. He realized no profits until the third sale because others, including Rolls Royce, the aircraft-engine manufacturer, first had to be paid out of the sales proceeds. Berry and Sky Cargo had no role in locating any of the purchasers or in completing any of these sales.

In September 2009, Berry emailed Hamilton, stating that he expected to receive half of

7

HCP's share of the profits when the aircraft were sold. (Def.'s Ex. 15). The email stated:

> [O]ur agreement is that [Sky Cargo] receives no fee at th[e] closing since the aircraft are now being grounded and sold immediately. Instead, [Sky Cargo] and [HCP] have agreed to share the [Hamilton] earnings on an equal basis as the aircraft are sold and closed. Will you remind me the final percentage of earnings that has been negotiated and confirmed for HCP? I would also appreciate final confirmation of the basis for each aircraft.

(*Id.*). Hamilton did not respond to the email. Berry acknowledged during the trial that Hamilton did not accept this arrangement.

Berry did not go unpaid. Sky Cargo received the $60,821.25 referral fee from PNC Bank. Berry did not inform Hamilton of the negotiation or payment of the fee until this lawsuit. Hamilton credibly testified that had he known Berry was negotiating for a loan-referral fee from PNC Bank while representing the interests of Hamilton and the Borrowers in the loan discussions and while seeking a fee from HCP for the same referral, Hamilton would not have dealt further with Berry and Sky Cargo on the loan, much less considered payment.

The lack of response to Berry's demands for payment did not deter him. Berry wrote Clay Healey a letter dated September 21, 2009, stating that he and Hamilton had agreed that HCP would pay Sky Cargo for placing the financing. (Def's Ex. 16). In the letter, Berry stated that, despite the absence of Hamilton's acceptance of Berry's divide-the-profits proposal, he and Hamilton had "mutually agreed that [Sky Cargo] would receive no payment for its services at the initial closing and funding of the financing/refinancing transaction which occurred last week. Instead, [HCP] proposed and [Sky Cargo] agreed to simply split and share on an equal 50/50 basis the net proceeds/earnings which will be due and payable to [HCP] upon subsequent sale and/or disposition of each of the six Aircraft." Berry gave Healey wiring instructions for his share of the profits. (*Id*.).

Similar letters followed as Berry learned that the aircraft were being sold. (Def.'s Ex. 17,

8

18).  In a letter dated December 23, 2009, to Healey, Berry described his role as follows:

> [A]s you know, Travis [Hamilton] approached [Sky Cargo] last spring to assist in locating new debt financing for these aircraft on behalf of an investor group . . . .  After significant work, communication, and document sharing with Hamilton and PNC Bank, it was determined that PNC Bank did indeed have an active interest in the transaction.  [Sky Cargo] provided PNC's loan application forms to [Hamilton], the forms were completed, signed, and returned to [Sky Cargo].  [Sky Cargo] then forwarded these forms and other documents to [PNC] for review and processing.
>
> At that point, [Sky Cargo] introduced Travis Hamilton as the agent for the proposed borrowing entities and Mr. Michael Scears who was acting as attorney for the borrowing entities to . . . PNC Bank. . . . PNC Bank subsequently prepared and delivered its loan proposals to Mr. Hamilton and Mr. Scears, the terms of which were deemed acceptable. Subsequently, [Sky Cargo] arranged for you . . . and Mr. Hamilton to personally meet with [PNC] in furtherance of the transaction and so that the lender (PNC Bank) and borrowing entities could communicate and complete the transaction directly among themselves with complete transparency.  The initial transaction closed in September, 2009 with PNC Bank providing the debt financing.

(Def.'s Ex. 18).

During this same period, Hamilton and Berry exchanged emails.  In an email dated December 23, 2009, Hamilton told Berry that:

> there was never any formal agreement for you to make 50% of the profit and there is no way you can make more than me or the principals in this deal. . . . The PNC deal you attempted to structure would have never closed and the deal was only closed with the assistance of our law firm and the executives within the bank.
>
> I have no authority on behalf of the owners of the aircraft to remit any payment to you nor have I [or] my company made any money in this deal to date.

(Def.'s Ex. 20). On December 28, 2009, after Berry sent the letter to Healey, Hamilton repeated in an email to Berry that:

> To date there is absolutely no money or funds due to you or [Sky

9

> Cargo] in any way. There are no profits that have been earned by [Hamilton] nor is there any agreement in place with the owners of this aircraft. [Sky Cargo] did not close or assist in anyway in the closing of the loan with PNC bank. The terms to which you presented to PNC would have never closed nor would they have passed the credit review process of the bank. The transaction was completely restructured under the complete guidance and control of the owners of the aircraft and their counsel.

(Def's Ex. 21). The email explained that HCP had not yet received any earnings from the subsequent sales of the aircraft. (*Id.*).

In January 2010, Berry continued trying to enforce what he described as a commitment by HCP to pay Sky Cargo 50 % of the profits HCP received when the aircraft were sold, or a 16.5 % share of the net profits. Alternatively, Berry stated that Sky Cargo would accept a flat 1 % arrangement fee based on the loan amount of approximately $49 million. (Def.'s Ex. 22). Despite the absence of any responses to his demands, in February 2010, Berry wrote another letter to Michael Scears, trustee of the Borrowers, after another aircraft had been sold. The letter stated that "[s]ince you did not reply to our prior correspondence and likewise no payment, we must assume that your decision is to simply pay 16.50 % of the profits rather than the flat fee for services." (Def.'s Ex. 23). No response was received.

In March 2010, Berry again wrote to Hamilton, demanding a 16.5 % share of HCP's profits as the aircraft were sold. (Def.'s Ex. 24). No response was received. Berry's emails and letters stating that Hamilton had offered to pay Sky Cargo a share of the profits from the subsequent sales of the aircraft, and that Berry had accepted this offer, are not proof that Hamilton had made this offer. This court finds that Hamilton did not offer Berry a share of either the revenues or profits HCP received when the aircraft subsequently sold.

The testimony of both Berry and Hamilton raised credibility concerns. Berry's assertions, in emails and in testimony, that Hamilton offered to share the profits of the subsequent aircraft sales,

10

were not credible. Hamilton's testimony that his offer to pay Sky Cargo $50,000 per aircraft only if Berry located the buyer for that aircraft was not credible.

This court finds that both Hamilton and Berry expected that Sky Cargo would be compensated for Berry's assistance in the loan transaction. That assistance was primarily in making the initial introduction and presentation to PNC Bank. After the initial introduction and the proposal presentations, Hamilton continued to ask Berry for additional work. Hamilton credibly testified that at least some of the work was late and caused problems for the negotiations. While this work included suggestions for the loan, Hamilton credibly testified that he could not, and did not, use many of those suggestions because they were unhelpful.

Berry did perform additional work on the loan at Hamilton's request and with Hamilton's knowledge during the period from mid-May 2009 to the latter part of July 2009. But the evidence is unclear and unreliable as to the amount of Berry's time this work required or whether it involved out-of-pocket expenses. Though the evidence shows that Hamilton accepted some of Sky Cargo's work after Berry made the initial proposals to PNC Bank, that stopped once Hamilton realized the extent of the problems. Mayer was engaged to resolve the problems, and he did.

The court finds that the primary value of Berry's services was in the initial contact and presentation to PNC Bank of the proposal that led to the loan. The value of the benefits Hamilton ultimately received from the subsequent sales of the aircraft, sales in which Sky Cargo played no role, are not the appropriate measure of the reasonable value of the services Berry rendered working on the loan transaction. The $50,000 per-aircraft-sold offer that Berry did not accept is similarly not an appropriate measure of the reasonable value of the services Berry rendered during the negotiations that led to the loan transaction.

The appropriate award instead uses what Berry appears to have recognized as a valid

measure of the value of the type of loan-referral services Berry provided. Using that measure, the court finds that the quantum meruit recovery is $60,000. This is a reasonable award for the valuable services Sky Cargo rendered at Hamilton's request, under circumstances that put Hamilton on notice that Sky Cargo expected to be paid for rendering those services.

### III.     Conclusions of Law

#### A.     Breach of Express Contract

Sky Cargo sued for breach of an express contract by Hamilton to pay a commission for finding the lender. Under Texas law, "'[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Smith Int'l., Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)). There are five identical requirements for a valid and binding written or oral contract: "1) an offer, 2) acceptance in strict compliance with the terms of the offer, 3) a meeting of the minds, 4) each party's consent to the terms, and 5) execution and delivery of the contract with the intent that it be mutual and binding." *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied). "It is well settled that an acceptance must not change or qualify the terms of the offer. If it does, the offer is rejected." *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968) (citation omitted). During the bench trial, Sky Cargo acknowledged that an enforceable express contract did not exist and abandoned this claim. The trial testimony also clarified that the contract terms Sky Cargo relied upon for this claim were either modified and replaced or proposed and rejected.

Sky Cargo had alleged an express contract based on conversations and a series of emails

between Berry and Hamilton, both of whom testified at the bench trial. Sky Cargo alleged that in May 2009, it contracted with Hamilton for a finder's fee of 1 % of the loan amount for two aircraft. Berry testified, and Sky Cargo acknowledged in its pleadings and in the joint pretrial order, that PNC Bank rejected this loan transaction. Any proposal to pay Sky Cargo 1 % of the loan amount was for a May 2009 proposed loan that failed. That proposed loan was between different parties, for different and fewer aircraft, with materially different terms than the loan that closed.

Sky Cargo alleged that, in July 2009, it agreed to Hamilton's proposal to modify the commission to $50,000 per aircraft, to be paid when each aircraft was sold. In its amended complaint and in the joint pretrial order, Sky Cargo alleged a right to be paid $300,000 on this express contract. Hamilton proposed paying Sky Cargo $50,000 per aircraft when the aircraft sold. That proposal was not contingent on Sky Cargo locating the buyer, as Hamilton testified. But the evidence also showed that Berry and Sky Cargo did not accept the $50,000 per aircraft proposal.

During the bench trial, Berry testified that he instead presented a counteroffer to Hamilton to be paid 1 % of the profits Hamilton received when the Borrowers sold the aircraft. *United Concrete*, 430 S.W.2d at 364. Berry acknowledged in his testimony, and counsel for Sky Cargo acknowledged in his closing argument, that the terms of this counteroffer were indefinite and that there was no acceptance. Although it was unclear whether Berry was offering to agree to a compensation arrangement of 50 % of the profits Hamilton would receive when the aircraft sold or 50 % of the revenues Hamilton would receive, it appeared from the emails and letters that Berry was referring to profits. But there was no evidence of the amount of profits Hamilton or HCP realized when the aircraft were sold. The only evidence was that HCP was ultimately paid $1.5 million in revenues. The absence of such evidence is a further basis for concluding that Sky Cargo cannot prevail on its claim for breach of express contract.

As Sky Cargo acknowledged in abandoning its express contact claim, Sky Cargo and Hamilton did not form a binding, enforceable contract requiring HCP to pay Sky Cargo for its role in the financing and sale of the six Citation aircraft in 2009.

### B. Quantum Meruit and Unjust Enrichment

At trial, after abandoning its claim for breach of express contract, Sky Cargo relied on its allegations that it was entitled to compensation based on an implied contract (quantum meruit) or unjust enrichment. Hamilton vigorously disputed this theory of liability. Hamilton noted that Sky Cargo negotiated and received $60,831.25 as a finder's fee from PNC Bank. Hamilton argued that this fully compensated Sky Cargo for its limited role in obtaining the financing for the transaction. Hamilton also argued that Sky Cargo's failure to disclose the finder's fee from PNC Bank while negotiating a commission from Hamilton made Sky Cargo ineligible for equitable relief because of its unclean hands.

Quantum meruit provides an equitable remedy that does not arise out of or depend on an enforceable express contract. *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). "Generally, a party may recover under quantum meruit only when there is no express contract covering the services or materials furnished." *Id.* Founded on unjust enrichment, "[r]ecovery in quantum meruit will be had when non-payment for the services rendered would result in an unjust enrichment to the party benefitted by the work." *Id.* (quotation omitted). "To recover under quantum meruit, a claimant must prove that: 1) valuable services were rendered or materials furnished; 2) for the person sought to be charged; 3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; 4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Id.* (quotation omitted). The efforts must

have been "undertaken for the person to be charged and not just that the efforts benefitted that person." *KUV Partners, LLC v. Fares*, 2011 WL 944453, at *16 (Tex. App.—Fort Worth Mar. 17, 2011, no pet.); *see also* Candace S. Kovacic, *A Proposal to Simplify Quantum Meruit Litigation*, 35 Am. U. L. Rev. 547, 553 (1986) (tracing the development of modern-day quantum meruit litigation back to the writ of assumpsit).

"In Texas, quantum meruit is appropriate only where the plaintiff provides valuable services specifically for the defendant, not merely where the services benefitted the defendant." *Eagle Metal Prods., LLC v. Keymark Enters., LLC*, 651 F. Supp. 2d 577, 595–96 (N.D. Tex. 2009) (emphasis omitted). "Quantum meruit 'is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.'" *Speck v. First Evangelical Lutheran Church*, 235 S.W.3d 811, 815 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Campbell v. Nw. Nat'l Life Ins. Co.*, 573 S.W.2d 496, 498 (Tex. 1978)).[3]

As an initial matter, Hamilton's unclean-hands defense to recovery in quantum meruit fails. A party seeking recovery in quantum meruit must come to the court with "clean hands." *In re Gamble*, 71 S.W.3d 313, 325 (Tex. 2002) (Baker, J. concurring). The doctrine presumes that only the equitable can seek equity: "equitable relief is not warranted when the plaintiff has engaged in unlawful or inequitable conduct with regard to the issue in dispute." *In re Francis*, 186 S.W.3d 534, 551 (Tex. 2006). But Texas law requires the party asserting an unclean-hands defense to show that it suffered a "serious harm" as a result of the inequitable conduct. The party asserting the defense must show that "he himself has been injured by such conduct." *Omohundro v. Matthews*, 341

---

[3] There is a second legal basis to recover under quantum meruit. Recovery is allowed when a plaintiff partially performs an express contract but, because of the defendant's breach, the plaintiff is prevented from completing the contract. *See Truly v. Austin*, 744 S.W.2d 934, 935 (Tex. 1988). This basis for recovery does not apply because there is no express contract and because there is no breach by Hamilton that prevented Sky Cargo from completing the contract.

S.W.2d 401, 410 (Tex. 1960); *Afri-Carib Enters., Inc. v. Mabon Ltd.*, 287 S.W.3d 217, 223 (Tex. App. — Houston [14th Dist.] 2009) (the clean-hands doctrine does not apply unless "the misconduct at issue is connected to the subject of the litigation and the party asserting the defense has been seriously harmed by the misconduct."), *rev'd on other grounds*, 369 S.W.3d 809 (Tex. 2012). The evidence did not show that Hamilton or HCP was seriously harmed by the fact that Sky Cargo negotiated for, received, and did not disclose, the finder's fee from PNC Bank. Sky Cargo is not precluded from pursuing its quantum meruit and unjust enrichment claim because of its failure to disclose the fee it received from PNC Bank.

Turning to the merits of the quantum meruit claim, the evidence shows that Sky Cargo established that Berry rendered valuable services to Hamilton, services that Hamilton accepted and used. *Vortt Exploration*, 787 S.W.2d at 944. The evidence shows that Hamilton accepted Berry's services and used them under circumstances that reasonably notified Hamilton that Berry performed the services expecting to be paid. *Id.*; *see PIC Reajudge lty Corp. v. Southfield Farms, Inc.,* 832 S.W.2d 610, 613–14 (Tex. App.—Corpus Christi, no writ).

The evidence Sky Cargo presented focused on the fact that the loan Berry worked on benefitted Hamilton because it made possible the subsequent sales of the aircraft and the resulting payments to Hamilton. The evidence Hamilton presented focused on the difficulties Berry's subsequent work created for the loan negotiations and the absence of benefit conferred by that work. But the ultimate extent of the benefit received is not the only, or most critical, aspect of the quantum meruit analysis. Rather, the key is that there were valuable services "undertaken for the person to be charged" — Hamilton — and "not just that the efforts benefitted that person." *KUV Partners*, 2011 WL 944453, at *16; *see also Caton v. Leach Corp.*, 896 F.2d 939, 947 (5th Cir. 1990) ("Under Texas law, the remedy of restitution is available through the theory of quantum meruit.").

16

The court finds and concludes that Berry provided valuable services to Hamilton with the shared understanding that Sky Cargo would be compensated. The primary value of those services was in the initial presentation to PNC Bank of the proposal that led to the loan. The value of the benefits Hamilton and HCP ultimately received from the subsequent sales of the aircraft, sales in which Sky Cargo played no role, are not the appropriate measure of the reasonable value of the services Berry rendered working on the loan transaction. The $50,000 per-aircraft-sold offer that Berry did not accept is similarly not an appropriate measure of the reasonable value of the services Berry rendered during the negotiations that led to the loan transaction.

The finder's fee does serve as an indication of the value of Berry's primary service in the loan transaction — locating PNC Bank as a lender and introducing it to what Hamilton and others had prepared as an early proposed version of the loan that ultimately closed. The evidence shows that Berry had agreed to split a finder's fee of 1/4 of 1 % of the loan that closed with PNC Bank, or $60,831.25. The court finds that to be a recognized measure of the value of the type of loan-referral services Sky Cargo provided. Using that measure, the quantum meruit recovery is $60,000. This is a reasonable award for the valuable services Sky Cargo rendered at Hamilton's request, under circumstances that put Hamilton on notice that Sky Cargo expected to be paid for rendering those services.

## IV. Conclusion

For the reasons stated above, this court finds and concludes as follows:

- Sky Cargo is not entitled to recovery for breach of an express contract.
- Sky Cargo is entitled to recovery under quantum meruit in the amount of $60,000.00.

Final judgment is entered by separate order. Sky Cargo may present evidence of its attorney's fees by affidavit within the time limits established by Rule 54 of the Federal Rules of

Civil Procedure.[4]

        SIGNED on August 27, 2013, at Houston, Texas.

                                                      _____
                                                        Lee H. Rosenthal
                                                  United States District Judge

---

[4] *See* Tex. Civ. Prac. & Rem. Code § 38.001 (1)-(2) (reasonable attorney's fees available for rendered services and performed labor); *Tucker v. Thomas*, No. 14-09-01081-cv, 2011 WL 6644710, at * n.5 (Tex. App. — Houston [14th Dist.] 2011) (citing *Perry & Perry Builders, Inc. v. Galvan*, No 03-02-00091-CV, 2003 WL 21705248, at *8 (Tex. App. — Austin 2003, no pet.)).